UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JEFFERY ROBERSON,<br>on behalf of himself and<br>all other similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>UNLIMITED CARRIER, INC.,<br>AGLE EXPRESS, INC.,<br>TRANS QUALITY, INC.,<br>SVAJUNAS MASIULIONIS, individually, and<br>ARNOLDAS BLINSTRUBAS, individually<br><br>                    Defendants. | Civil Action No. 1:21-cv-00742 |

**PLAINTIFFS' ASSENTED-TO MOTION FOR
FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND
<u>MEMORANDUM IN SUPPORT THEREOF</u>**

# Table of Contents

I. INTRODUCTION AND BACKGROUND ............................................................................ 3
II. OVERVIEW OF PROPOSED SETTLEMENT AND DISTRIBUTION PROCESS ............. 4
III. RESULTS OF NOTICE PROCESS ..................................................................................... 6
IV. THE COURT SHOULD APPROVE THE PROPOSED SETTLEMENT AS FAIR, REASONABLE, AND ADEQUATE. ................................................................................... 8
   A. ALL FACTORS WEIGH IN FAVOR OF FINDING THAT THE PROPOSED SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE. ........................................................................................ 8
   B. THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS. ............................. 12
   C. THE PROPOSED INCENTIVE PAYMENT IS FAIR AND REASONABLE ................................. 14
   D. THE PROPOSED ATTORNEYS' FEE AWARD IS FAIR AND REASONABLE. ......................... 15
V. CONCLUSION ................................................................................................................... 19

## I.  Introduction and Background

Plaintiff Jeffery Roberson seeks final approval pursuant to Fed. R. Civ. P. 23 of a proposed class action settlement. A proposed order is attached as Exhibit A. The settlement agreement ("Agreement") is attached as Exhibit B.

Mr. Roberson initiated this action on February 9, 2021. *See* ECF No. 1. He filed an Amended Class Action Complaint on March 16, 2021. *See* ECF No. 16. The amended complaint alleges that Defendants misclassified Mr. Roberson and others similarly situated as independent contractors and asserts claims for allegedly failing to pay drivers all wages earned; taking unlawful deductions from drivers' compensation; failing to reimburse drivers for expenditures and losses required of drivers; liquidated damages; and attorneys' fees and costs under the Illinois Wage Payment and Collection Act ("IWPCA").

On November 24, 2021, the parties entered into an Agreement Regarding Settlement Negotiations Pursuant to FRE 408 (Negotiation Agreement), which established a mediation procedure including data and document production, including exemplar Owner Operator Agreements and Vehicle Use Agreements used during the class period, settlement data (including revenue, chargebacks and reimbursements) and mileage data. Prior to the mediation, Plaintiffs sent a proposed Second Amended Complaint to Defendants asserting claims under the Truth-in-Leasing Regulations (49 C.F.R. § 376.1 *et seq.*), which claim was included in the parties' negotiations at the mediation conducted on May 17, 2022, with the Hon. James Epstein (Ret.) at JAMS-Chicago. The mediation resulted in the Agreement attached as Exhibit B.

On August 12, 2022, the Court issued a preliminary approval order, finding that the Agreement fell within the range of reasonableness and otherwise met the requirements for

preliminary approval. The Court also authorized Plaintiffs to send an approved notice of class action settlement to the conditionally-certified settlement class.

Plaintiffs now submit to the Court their assented-to motion for final approval of this class action settlement. To effectuate the terms of the Agreement, the parties seek certification of a settlement class, for settlement purposes only, defined as follows:

> All persons who entered into an Owner Operator Agreement as an individual, a corporation, or LLC, with either Unlimited Carrier, Inc. and/or Trans Quality, Inc. and, under that Owner Operator Agreement, personally transported product offered by Unlimited Carrier, Inc. or Trans Quality, Inc. while leasing vehicles from AGLE Express, Inc. from February 9, 2011 to July 24, 2021.

Thirty-eight (38) individuals, including Mr. Roberson, meet this proposed definition. Plaintiffs also seek a determination from the Court that the Agreement is fair, reasonable, and adequate to the members of the settlement class.

## II.     Overview of Proposed Settlement and Distribution Process

The parties have agreed to resolve this case for $900,000. From that gross amount, Plaintiffs propose that one-third be used to pay Plaintiffs' counsel for their attorneys' fees (totaling $300,000); that $9,000 be used to compensate Plaintiffs' counsel for actual costs; that $7,500 be awarded to the named plaintiff as an incentive payment in recognition of Mr. Roberson's risk and initiative in pursuing his claims on behalf of his fellow drivers; and that $3,500 be used to pay the settlement administrator for its services. The remaining amount (not less than $580,000) will be distributed to the 38 settlement class members. The settlement agreement calls for the amount of each such payment to be calculated on a pro-rata basis relative to the total amount of deductions taken from settlement class members' compensation during Defendants' weekly settlement process.

Although the settlement agreement contained a procedure if five or more members of the settlement class requested to be excluded from the settlement, no settlement class members did so. *See* Affidavit of Anthony Gomez ("Gomez Aff."), ¶ 10, attached as Exhibit C.

To allow for the proper tax reporting, and to avoid the need for backup tax withholdings, each settlement class member was asked to provide the settlement administrator an I.R.S. Form W-9, or an equivalent, as part of the notice process. Since no class members did so, the parties have agreed upon minor revisions to the settlement process set forth in the Agreement, resulting in the following timeline:

Twenty-one (21) days after the Effective Date of the Agreement, or as soon thereafter as practicable, Optime will issue each Settlement Class Member a $500 payment (with no withholding), along with a letter approved by the parties' counsel explaining that the settlement has received final approval and detailing the claims released by the recipient, along with the URL for the informational website where the recipient can access a copy of the Final Approval Order. The cover letter shall further provide the deadline for returning the enclosed I.R.S. Form W-9 and describe the consequences for not returning the I.R.S. W-9, i.e. that the administrator will need to do backup withholding in the amount of 24 percent.

Sixty (60) days after these initial payments are mailed shall be the deadline for Settlement Class Members to return the I.R.S. Form W-9 in order to receive the remainder of Individual Settlement Amount without backup withholding.

Within seven (7) days after the deadline to return the I.R.S. Form W-9, Optime will mail the remainder of the Individual Settlement Amounts. If the I.R.S. Form W-9 was returned, the full remainder of the Individual Settlement Amount (the Individual Settlement Amount less the $500 initial payment) will be issued to the Class Member; if no Form W-9 was returned, the net

check amount will be the Individual Settlement Amount less the $500 initial payment less backup withholding of 24 percent.

No later than the last day of the calendar month in which the remaining Individual Settlement Amounts are issued, Optime will remit backup withholding payments, if any, to appropriate taxing authorities and report to the parties' counsel regarding tax payments made.

For ninety (90) days after Optime mails the remainder payments, Optime may use any residual funds (i.e. from uncashed checks) to resolve any disputes which may arise.

Within seven (7) days of the expiration of the 90-day-period, Optime shall pay itself the costs of administration for all reasonable costs associated with its work under the Agreement in an amount not to exceed $3,500. If Optime's reasonable costs exceed $3,500, Optime will file a declaration to seek court approval for payment of costs of administration in excess of $3,500.

Within seven (7) days after Optime pays itself or within seven (7) days after the court's ruling on any request by Optime for approval of the Costs of Administration exceeding $3,500, Optime shall prepare and send to the parties' counsel an accounting of the settlement distributions that identifies any checks issued but not cashed.

Within seven (7) days after Optime provides this accounting to the parties' counsel:

- If $5,000 or more in residual funds remain, Optime will redistribute all remaining funds to Settlement Class Members who cashed their checks in proportion to their Individual Settlement Amounts.

- If less than $5,000 remains, Optime shall issue a check with the *cy pres* amount, comprised of the value of the uncashed checks, if any, to the *cy pres* recipient chosen by the parties, NextGen Trucking Association.

### III. Results of Notice Process

After the Court issued its preliminary approval order, the plaintiffs retained Optime Administration, LLC, the Court-approved settlement administrator, to administer the notice and settlement process. Prior to issuing notice, Optime created a settlement website,

https://agleexpresssettlement.com/, so that class members could easily access all of the information contained in the class notice. *See* Ex. C, Gomez Aff. A copy of the informational website is attached as Exhibit 3 to the Gomez Aff. On September 6, 2022, Optime mailed the approved notice by first-class mail to the last known address of all members of the proposed settlement class. Gomez Aff. ¶ 5. A copy of the notice packet is attached as Exhibit 1 to the Gomez Aff. Optime also issued a text message notice to the last known phone number of class members, which contained a URL link to the informational website. Gomez Aff. ¶ 6. A copy of the text message is attached as Exhibit 2 to the Gomez Aff.

Notice packets that were returned to Optime by the United States Postal Service (USPS) as undeliverable were promptly researched through a public records database called Delvepoint. If an updated address was found in the database, the mailing packet was resent via first class mail. Gomez Aff. ¶ 7. As of November 7, 2022, 10 mailing packets had been returned as undeliverable by USPS. *Id.* Of the 10 addresses that were deemed undeliverable by the USPS, 7 updated addresses were found through Delvepoint. *Id.* Mailing packets were resent to those 7 addresses. *Id.* As of November 7, 2022, 35 of the 38 notice packets were successfully delivered. Gomez Aff. ¶ 8. Optime received no objections and no requests for exclusion. *Id.* ¶¶ 9-10.

Sending notice by first-class mail to the last known address of each settlement class member, coupled with notice by website publication and text message, is undoubtedly the most practicable and widely accepted means of disseminating information about the settlement. *See, e.g., Hughes v. Merit Lincoln Park LLC*, No. 08-CV-6191, 2011 WL 6028535, at *2 (N.D. Ill. Dec. 5, 2011) ("First class mail will generally satisfy Rule 23(c)(2)'s requirement of "the best notice practicable under the circumstances."); *In re VMS Ltd. P'ship Sec. Litig.*, No. 90 C 2412, 1995 WL 355722, at *1 (N.D. Ill. June 12, 1995); *In re AT & T Mobility Wireless Data*

*Services Sales Tax Litig.*, 789 F. Supp. 2d 935 (N.D. Ill. 2011) (notice by text message, email, and publication in a national newspaper satisfied Rule 23 and due process); *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560 (N.D. Ill. 2011) (paper notice included with customers' monthly bills and publication of a settlement website satisfied due process and Rule 23's notice requirements).

## IV. The Court Should Approve the Proposed Settlement as Fair, Reasonable, and Adequate.

Federal policy strongly favors settlement. *Pesek v. Donahue*, No. 04 C 4525, 2006 WL 1049969, at *4 (N.D. Ill. Feb. 9, 2006) ("There is a strong federal policy favoring the voluntary resolutions of disputes."); Newberg on Class Actions, §13:44 ("The compromise of complex litigation is encouraged by the courts and favored by public policy"). The advantages of settlement to the parties and the courts are particularly apparent in the compromise of class actions, which are "often complex, drawn out proceedings demanding a large share of finite judicial resources." *Mayfield v. Barr*, 985 F.2d 1090, 1092 (D.C. Cir. 1993); *see also Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("In the class action context in particular, 'there is an overriding public interest in favor of settlement,' [which] minimizes the litigation expenses of both parties and also reduces the strain such litigation imposes upon already scarce judicial resources").

### A. All Factors Weigh in Favor of Finding that the Proposed Settlement is Fair, Reasonable, and Adequate.

Before giving final approval to a class action settlement, this Court must find that the settlement is fair, reasonable, and adequate. *See* Fed. R. Civ. P. 23(e). "Courts consider five factors when evaluating a class settlement: (1) the strength of Plaintiff's case compared to the terms of the proposed settlement; (2) the likely complexity, length, and expense of continued

litigation; (3) the amount of opposition to the settlement among affected parties; (4) the opinion of competent counsel; and (5) the stage of the proceedings and amount of discovery completed." *Young v. Rolling in the Dough, Inc.*, No. 1:17-CV-07825, 2020 WL 969616, at *3 (N.D. Ill. Feb. 27, 2020).

With respect to the first factor, the proposed settlement results in a substantial recovery for members of the settlement class, notwithstanding the many contested issues as to which plaintiffs would need to prevail in order to arrive at the damages phase of a trial. In order to prevail on their Illinois Wage Payment and Collection Act ("IWPCA") claims, Plaintiffs would need to prove that (a) the IWPCA is applicable to the work performed by the named plaintiff, who is a non-resident of Illinois, and other non-resident members of the proposed settlement class; (b) they were misclassified by Defendants as independent contractors instead of as employees under the IWPCA; and (c) the deductions taken from their gross compensation were unlawful under the IWPCA. The IWPCA allows deductions to be taken from employees' wages if they are "(1) required by law; (2) to the benefit of the employee; (3) in response to a valid wage assignment or wage deduction order; [or] (4) made with the express written consent of the employee, given freely at the time the deduction is made." *Costello v. BeavEx, Inc.*, 810 F.3d 1045, 1050 (7th Cir. 2016), *quoting* 820 ILCS 115/9. With respect to the deductions, the contested issues are whether the deductions were for the benefit of Plaintiffs, and whether Plaintiffs provided Defendants with appropriate written consent.

Prior to mediation, plaintiffs' counsel estimated that the total maximum recovery for the class would be approximately $2.2 million in single damages, which represents <u>all</u> deductions taken from drivers' settlements. The net settlement amount to be distributed to the class – no less than $580,000 – represents more than one-fourth of this maximum recovery. The notice to class

9

members provided each member with the estimated amount of their individual settlement check under the settlement, which ranged from a minimum of $579 (for a class member who only worked as a lease driver for defendants for approximately one week) to a maximum of $55,644. The average individual settlement amount for the 38 settlement class members was $15,237 per person. In light of the multiple issues of law and fact that would need to be resolved in the plaintiffs' favor, and the uncertainty of that resolution, the settlement amounts that class members are certain to receive under the settlement "reflect[] a fair compromise of the various contested issues in this case." *Young*, 2020 WL 969616, at *4.

The likely complexity, length, and expense of continued litigation – the second factor – also weighs heavily in favor of approval. "Wage and hour class and collective actions, such as this, are inherently complex and time-consuming." *Young*, 2020 WL 969616, at *4. First, the case would need to be certified under Rule 23, preceded by relevant discovery. If the Court were to issue a decision certifying the class, notice would then need to issue so that members of the class would have the opportunity, required by Rule 23, to opt out of the class. After notice, both parties would likely move for full or partial summary judgment. For example, in the absence of settlement, Defendants likely would have moved for summary judgment on the issue of the applicability of the IWPCA to the work of nonresidents of Illinois. Only after the resolution of issues on summary judgment would the remaining issues proceed to trial, which could be years in the future. The proposed settlement, on the other hand, puts real and significant dollars in the hands of drivers now, which is why Plaintiffs' counsel is of the opinion that this settlement is fair, reasonable, and adequate.

Since no settlement class members objected or requested exclusion from the settlement, the Court may conclude that there was no opposition to the settlement - the third factor.

With respect to the fourth factor, the opinion of Plaintiffs' counsel should be given considerable weight, as they are highly experienced in this type of litigation. Hillary Schwab, Brant Casavant, and Rachel Smit of Fair Work, P.C., and Marc Siegel and Bradley Manewith of Siegel & Dolan, Ltd., together have extensive experience litigating class actions as class counsel for truck drivers. *See, e.g.*, *Haworth v. New Prime, Inc.*, No. 21-03211-CV-S-BP (W.D. Mo. Nov. 7, 2022) (certifying nationwide Rule 23 class of second-seat drivers); *Gonzalez v. XPO Last Mile, Inc.*, 579 F. Supp. 3d 252, 262 (D. Mass. 2022) (certifying Rule 23 class of delivery drivers; "the Court . . . understands that the plaintiffs' chosen counsel is well-qualified to prosecute the case"); *Haworth v. New Prime, Inc.*, 448 F. Supp. 3d 1060 (W.D. Mo. 2020) (conditionally certifying nationwide FLSA collective action); *Johnson v. Diakon Logistics*, No. 16-CV-06776, 2020 WL 405636, at *1 (N.D. Ill. Jan. 23, 2020) (certifying Rule 23 class of delivery drivers bringing IWPCA claims); *Montoya v. CRST Expedited, Inc.*, 311 F. Supp. 3d 411, 425 (D. Mass. 2018) (certifying nationwide Rule 23 class(es) of truck drivers as well as FLSA collective action; noting that the defendants did not "challenge the bona fides of Montoya's counsel"). Plaintiffs' counsel has also settled numerous class actions, including on behalf of nationwide classes of truck drivers. *See, e.g.*, *Montoya v. CRST Expedited, Inc.*, No. 16-10095 (D. Mass. May 27, 2021); *Oliveira v. New Prime, Inc.*, No. 15-10603 (D. Mass. Jan. 26, 2021). They are well-versed in this area of law and are familiar with the issues and risks involved in wage and hour-related litigation.

As to the last factor – the stage of the proceedings and the amount of discovery completed – "the pertinent inquiry is what facts and information have been provided,"

*In re AT & T Mobility Wireless Data Servs. Sales Tax Litig.*, 789 F. Supp. 2d 935, 967 (N.D. Ill. 2011), not whether the parties had completed formal discovery, *Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 587 (N.D. Ill. 2011); *see also In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 537 (3d Cir. 2004) (framing this factor as "whether counsel had an adequate appreciation of the merits of the case before negotiating"). Plaintiffs' counsel requested, and Defendants' counsel provided, detailed data demonstrating driver revenue and deductions from pay, thereby allowing counsel to assess the range of damages at stake in the litigation and the associated risks of continued litigation. This process was "sufficient … to weigh the strengths and weaknesses of their claims and to accurately estimate the damages at issue." *Beckman v. KeyBank, N.A.*, 293 F.R.D. 467, 475 (S.D.N.Y. 2013). Here, the parties and their counsel were amply aware of the strengths and weaknesses of the case as a result of their informal discovery, their experience with similar cases, and as a result of their mediation with Judge Epstein. The early stage of the proceedings does not weigh against approval, since "[e]arly resolution of claims is encouraged by district courts." *Young*, 2020 WL 969616, at *5.

All five factors considered by the Courts weigh in favor of finding the proposed settlement to be fair, reasonable, and adequate to the proposed settlement class.

    **B.**    **The Court Should Certify the Proposed Settlement Class.**

Additionally, the proposed settlement class is appropriate for settlement purposes. *See Newberg* § 11.27 ("When the court has not yet entered a formal order determining that the action may be maintained as a class action, the parties may stipulate that it be maintained as a class action for the purpose of settlement only"). Certification for purposes of settlement only is a procedure with well-recognized practical purposes, which has been consistently upheld by the

Seventh Circuit. *See, e.g., Mars Steel Corp. v. Cont'l Illinois Nat. Bank & Tr. Co. of Chicago*, 834 F.2d 677, 681 (7th Cir. 1987).

The requirements of Rule 23(a) are met here with respect to numerosity, commonality, typicality, and adequacy. First, "numerosity is typically satisfied where there are at least forty members of a putative class." *Kolinek v. Walgreen Co.*, 311 F.R.D. 483, 491 (N.D. Ill. 2015). The proposed settlement class is just shy of forty, which does not represent a "magic number," but rather represents what has been commonly recognized by courts as "a sufficiently large group" to make joinder impracticable. *T.K. Through Leshore v. Bytedance Tech. Co.*, No. 19-CV-7915, 2022 WL 888943, at *3 (N.D. Ill. Mar. 25, 2022). Whether the actual number is 38 or 40 does not matter practically, especially since the proposed settlement class here consists of drivers who reside all over the United States and therefore are "widely scattered," making joinder impracticable. *Id.*

Second, commonality and typicality are met here because Plaintiffs have alleged that Mr. Roberson's statutory claims arise from uniform policies and practices, including standard form contracts that govern the relationship between Defendants and all members of the putative class.

Adequacy is met where the named plaintiff does not have interests that conflict with the class and where class counsel are experienced and qualified. Mr. Roberson has no identifiable interests that conflict with the class and, as demonstrated in Section IV.A., his counsel are more than qualified to represent the interests of the settlement class.

With respect to Rule 23(b)(3), "the case management and judicial economy concerns at the heart of the predominance requirement matter less when plaintiffs seek to certify a class for settlement purposes only." *T.K. Through Leshore*, 2022 WL 888943, at *5, *citing* Fed. R. Civ. P. 23(b) advisory committee's note to 1966 amendment. Because "common questions represent a

significant aspect" of this case, the predominance requirement is met here. *Id.* (citation omitted). Similarly, where "plaintiffs seek to certify a class for settlement purposes only, trial-related concerns do not factor into a court's analysis of superiority." *Id.* The fact that this settlement will resolve the claims of all 38 class members in one adjudication satisfies the superiority requirement of Rule 23(b)(3).

For all of these reasons, the Court should certify the proposed settlement class for settlement purposes only.

   C. **The Proposed Incentive Payment is Fair and Reasonable.**

Plaintiffs request an incentive award of $7,500 for the named plaintiff. The proposed payment is intended to compensate Jeffery Roberson for the effort and risk associated with his role in initiating this lawsuit that has resulted in a substantial recovery for the members of the proposed settlement class. Indeed, no members of the proposed settlement class have objected to this proposed incentive award.

Courts have widely recognized that incentive awards serve an important function in promoting enforcement of state and federal law by private individuals, while encouraging class action settlements. Class actions "permit citizens to function as private attorneys general." *Skirchak v. Dynamics Rsch. Corp.*, 508 F.3d 49, 58 (1st Cir. 2007). "Plaintiffs in class and collective actions play a crucial role in bringing justice to those who would otherwise be hidden from judicial scrutiny"; incentive awards recognize and compensate plaintiffs for playing this role. *Furman v. At Home Stores LLC*, No. 1:16-CV-08190, 2017 WL 1730995, at *2 (N.D. Ill. May 1, 2017); *Koszyk v. Country Fin. a/k/a CC Servs., Inc.*, No. 16 CIV. 3571, 2016 WL 5109196, at *2 (N.D. Ill. Sept. 16, 2016) ("Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to

participate in the suit."). Incentive awards serve a particularly important role in employment class actions, "because the plaintiffs assume the risk that future employers may look unfavorably upon them if they file suit against former employers." *Furman*, 2017 WL 1730995, at *2, *citing Beesley v. Int'l Paper Co.*, No. 06 C 703, 2014 WL 375432, at *4 (S.D. Ill. Jan. 31, 2014).

It is not uncommon for courts to approve incentive payments substantially greater than those requested in this case. *See, e.g.*, *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (affirming incentive award of $25,000 to ERISA named plaintiff); *Charvat v. Valente*, No. 12-CV-05746, 2019 WL 5576932, at *10 (N.D. Ill. Oct. 28, 2019) (awarding service award of $25,000 to Telephone Consumer Protection Act plaintiff); *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 1:15-CV-10447, 2016 WL 7018566, at *3 (N.D. Ill. Nov. 29, 2016) (approving incentive payments of $12,500 to each of two named plaintiffs in FLSA settlement); *Koszyk v. Country Fin. a/k/a CC Servs., Inc.*, No. 16 CIV. 3571, 2016 WL 5109196, at *2 (N.D. Ill. Sept. 16, 2016) (approving service awards of $10,000 to each named plaintiff in FLSA settlement).

Here, Mr. Roberson "filed this case at great risk" to himself, "provided valuable insight to his Counsel throughout the case," and his "efforts resulted in substantial payments" to members of the class." *Young*, 2020 WL 969616, at *7 (awarding incentive payment of $10,000 to named plaintiff).

For all of these reasons, Plaintiffs submit that the proposed incentive award of $7,500 should be approved.

**D.     The Proposed Attorneys' Fee Award is Fair and Reasonable.**

The proposed settlement provides for a standard one-third share of the gross settlement fund to be paid as attorneys' fees to Plaintiffs' counsel, as well as a reasonable amount ($9,000) to be paid to Plaintiffs' counsel for litigation expenses and to the settlement administrator

($3,500) for its services. The proposed allocation should be approved by the Court as fair and reasonable because, *inter alia*, no class members have objected to this distribution, Mr. Roberson signed a retainer agreement providing for a one-third contingency payment, and this arrangement reflects the market rate for employment class action attorneys in Northern Illinois.

Courts generally favor an award of fees from a common fund, as called for by the proposed settlement in this case. As the Supreme Court has explained:

> [T]his Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. . . . Jurisdiction over the fund involved in the litigation allows a Court to prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit.

*Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (citations omitted). When awarding fees from a common fund, the Seventh Circuit has directed district courts to "do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Koszyk v. Country Fin. a/k/a CC Servs., Inc.*, No. 16 CIV. 3571, 2016 WL 5109196, at *3 (N.D. Ill. Sept. 16, 2016), *quoting In re Synthroid Mktg. Litig*, 264 F.3d 712, 718 (7th Cir. 2001). A one-third contingency fee arrangement "is consistent with the market in the Northern District of Illinois." *Koszyk v. Country Fin. a/k/a CC Servs., Inc.*, No. 16 CIV. 3571, 2016 WL 5109196, at *4 (N.D. Ill. Sept. 16, 2016) ("In the Northern District of Illinois, class and collective action employment lawyers routinely contract to receive one-third of any potential settlement as compensation for taking on the risk of funding a potential multi-year litigation without any assurance of recovery. In addition, one-third is the standard contingent percentage that employment lawyers in the Northern District of Illinois charge individual clients. These multiple data points, confirming that plaintiffs routinely are willing to

agree to a one-third contingency fee arrangement, reinforces that Plaintiffs' Counsel are requesting the proper market rate."). For this reason, "district courts in the Seventh Circuit typically award 1/3 of the common fund in attorneys fees*." Young*, 2020 WL 969616, at *6 (awarding the requested 1/3 of the common fund in IWPCA case, as well as $17,035 in litigation and settlement administration costs).

Awarding one-third from the common fund recognizes the vital role that contingency arrangements play in making legal counsel available to individuals who cannot afford hourly fees. Unlike traditional firms that receive hourly fees on a regular, recurring basis, employment counsel who take cases on contingency often spend years litigating cases (typically while incurring significant out-of-pocket expenses for experts, transcripts, travel, etc.), without receiving any payment for their work. Sometimes fees and expenses are recovered; other times, despite hundreds of hours of work, nothing is recovered. This type of practice is viable only if attorneys, having received nothing for their work on some cases, receive more in other cases than they would if they charged hourly fees. Courts have long recognized this reality. *See, e.g., In re Union Carbide Corp. Consumer Products Business Securities Litigation*, 724 F. Supp. 160, 168 (S.D.N.Y. 1989) ("Contingent fee arrangements implicitly recognize the risk factor in litigation and that the winning cases must help pay for the losing ones if a lawyer who represents impecunious plaintiffs, or those plaintiffs not so fully committed as to put their own money where their mouth is, will remain solvent and available to serve the public interest.")

The inability of plaintiffs to afford hourly fees is especially common in the employment context, where many workers are low wage earners and cannot pay several hundred dollars per hour for legal representation. Contingency fee arrangements make it possible for firms such as Fair Work, P.C. and Siegel and Dolan, Ltd. to "serve the public interest" by taking on class

17

actions that deter wage law violations by employers. *Skirchak v. Dynamics Research Corp.*, 432 F. Supp. 2d 175, 178–79 (D. Mass. 2006) (Lasker, J.). "Allowing private attorneys to prosecute such actions in the aggregate effectively ensures enforcement of the wage laws by motivating employers to comply or face potentially large-scale litigation, and by providing counsel with an incentive to pursue such claims." *Id.* at 179.

A one-third award also recognizes that firms may spend years developing the case law in a particular field and obtaining favorable decisions, all of which contributes to efficient and effective litigation on behalf of plaintiffs. *See In re Giant Interactive Group Inc. Sec. Litigation*, 2011 WL 5244707, *10 (S.D.N.Y. Nov. 2, 2011) ("[T]he Court finds [th]at public policy supports the award of a 33% fee in this case, the better to 'attract well-qualified plaintiffs' counsel who are able to take a case to trial, and who defendants understand are able and willing to do so.'"), *quoting In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d. 319, 359 (S.D.N.Y. 2005). Here, for example, Plaintiffs' counsel collectively have extensive experience litigating class action wage cases on behalf of truck drivers and have contributed to the development of the law in this area. *See, e.g., Niiranen v. Carrier One, Inc.*, No. 20-CV-06781, 2022 WL 103722, at *1 (N.D. Ill. Jan. 11, 2022); *Johnson v. Diakon Logistics*, No. 16-CV-06776, 2020 WL 405636, at *1 (N.D. Ill. Jan. 23, 2020) (Attorneys Siegel and Manewith named class counsel); *Oliveira v. New Prime, Inc.*, 424 F. Supp. 3d 206, 208 (D. Mass. 2019) (briefed and argued by Attorney Schwab); *Montoya v. CRST Expedited, Inc.*, 311 F. Supp. 3d 411, 427 (D. Mass. 2018) (Attorneys Schwab and Smit named class counsel). This experience significantly increases the risks of trial and appeal for Defendants.

Based on these considerations, Plaintiffs proposes that a one-third award from the settlement fund for fees is fair and reasonable and ask that it be approved by the Court.

## V. Conclusion

Because the parties have demonstrated that the settlement is fair, reasonable, and adequate to the members of the proposed settlement class, Plaintiffs respectfully ask that the Court enter the proposed final approval order attached here as Exhibit A.

Respectfully submitted,

JEFFERY ROBERSON, individually and on behalf all others similarly situated,

By their attorneys,

Marc J. Siegel, #6238100
Bradley Manewith, #6280535
SIEGEL & DOLAN LTD.
150 North Wacker, Suite 3000
Chicago, Illinois 60606
Tel: (312) 878-3210
Fax: (312) 878-3211
msiegel@msiegellaw.com
banewith@msiegellaw.com

*/s/ Rachel Smit*
Hillary Schwab
   Admitted *pro hac vice*
Rachel Smit
   Admitted *pro hac vice*
Brant Casavant
   Admitted *pro hac vice*
FAIR WORK P.C.
192 South Street, Suite 450
Boston, MA 02111
Tel: (617) 607-3260
Fax: (617) 488-2261
hillary@fairworklaw.com
rachel@fairworklaw.com
brant@fairworklaw.com

Dated: November 18, 2022.